Vidal & Cía., S. en C., Demandante y Apelada, v. The American Railroad Company of P. R., Demandada y Apelante.

Apelación procedente de la Corte de Distrito de Ponce en pleito sobre daños y perjuicios.

Nos. 1918, 1919 y 1920.—Resuelto en marzo 26, 1920.

Transporte de Mercancías por Ferrocarril—Reglamento de la Ley de Policía de Ferrocarriles, Artículo 145.—El artículo 145 del reglamento para la ejecución de la ley de policía de ferrocarriles no es de aplicación a casos en que las mercancías entregadas para transportar, cuyo importe se reclama, han sido destruídas por incendio.

Id.—Porteador—Responsabilidad por Mercancías Recibidas para Transpor-

TAR—CÓDIGO DE COMERCIO, ARTÍCULOS 361, 362 Y 363, REGLAMENTO DE LA LEY DE POLICÍA DE FERROCARRILES, ARTÍCULO 139.—De acuerdo con los artículos 361, 362 y 363 del Código de Comercio, el porteador responde de pérdidas o menoscabos de las mercancías que se le entreguen para transportar por ferrocarril, a menos que pruebe que la destrucción o menoscabó se debió a caso fortuito, fuerza mayor o naturaleza y vicio propio de las cosas, pudiendo sin embargo probar el cargador que tales hechos ocurrieron por negligencia del porteador o por haber dejado de tomar las precauciones que el uso tiene adoptadas entre personas diligentes; pero para casos de incendio, según el artículo 139 del Reglamento de la ley de policía de ferrocarriles, deberá el porteador probar que ni fué ocasionado por la imprudencia o descuido de sus empleados ni por la insuficiencia o mala condición de los medios de transporte.

ID.—FUERZA MAYOR—CASO FORTUITO.—Entiéndese por *fuerza mayor* el acontecimiento que no hemos podido precaver ni resistir, y por *caso fortuito* el suceso inesperado o la fuerza mayor que no se puede precaver ni resistir.

ID.—INCENDIO DE MERCANCÍAS ENTREGADAS A UN FERROCARRIL PARA TRANSPORTAR.—Aunque el incendio puede ser considerado como caso fortuito o fuerza mayor, sin embargo, no todo incendio tiene ese carácter sino cuando no se pudo precaver ni resistir. El incendio ocurrido en mercancías entregadas a un porteador para su transporte y cuyas causas se desconocen, no puede ser considerado como fuerza mayor o caso fortuito porque no puede determinarse si pudo ser precavido o resistido.

ID.—RECLAMACIONES POR PÉRDIDAS DE MERCANCÍAS TRANSPORTADAS—ALEGACIÓN DE NEGLIGENCIA DEL PORTEADOR ES INNECESARIA.—En las reclamaciones por pérdida o menoscabo de las mercancías entregadas para transportar no es necesario alegar que la pérdida o deterioro fué causado por la negligencia del porteador, sino que fueron entregadas y no devueltas o que lo han sido con daño, así como su valor, para que surja el derecho a reclamar su importe.

ID.—REGLAMENTO DE LA LEY DE POLICÍA DE FERROCARRILES.—Los artículos 138 y 139 del Reglamento para la ejecución de la ley de policía de ferrocarriles promulgado en febrero de 1888 están vigentes porque no son contrarios a las instituciones americanas ni están derogados por ley alguna.

ID.—CONSEJO EJECUTIVO DE PUERTO RICO—REGULACIÓN DE LA RESPONSABILIDAD DE COMPAÑÍAS DE TRANSPORTE—PÉRDIDAS O AVERÍAS DE MERCANCÍAS TRANSPORTADAS.—La Ley Foraker no autorizaba al extinguido Consejo Ejecutivo de Puerto Rico para determinar y regular la responsabilidad de las compañías de transporte por las pérdidas o averías de las mercancías recibidas para transportar, por lo que, el artículo 139 del reglamento para la ejecución de la ley de policía de ferrocarriles no pudo ser derogado por la regla 16 del reglamento aprobado por el extinguido Consejo Ejecutivo de Puerto Rico en mayo 7, 1907.

Los hechos están expresados en la opinión.

Abogados de la apelante: Sres. *G. H. Moscoso, F. G. Pérez Almiroty* y *E. Acuña.*

Abogado de la apelada: *Sr. J. Tous Soto.*

El Juez Asociado Sr. Aldrey, emitió la opinión del tribunal.

En la madrugada del 31 de agosto de 1916 ocurrió un incendio en un almacén que The American Railroad Company of Porto Rico tiene en la ciudad de Ponce para su negocio de transporte de pasajeros y mercancías por ferrocarril. El fuego se comunicó a tres vagones que estaban inmediatos al almacén y que con otros más ocupaban las líneas que hay entre el almacén y la estación y fueron destruídas las mercancías que en ellos habían pertenecientes a las sociedades The Porto Rico Drug Company, Homar Colón y Cía. S. en C. y Vidal y Compañía S. en C. quienes demandaron a The American Railroad Company of Porto Rico reclamándole el pago del valor de dichas mercancías alegando que por su negligencia se había quemado el almacén y que por ella se había comunicado el fuego a los vagones cargados con sus mercancías. En los tres pleitos fué dictada sentencia condenando a la demandada a pagar determinadas cantidades y en todos interpuso la parte perjudicada por las sentencias recurso de apelación que fué argumentado conjuntamente ante nosotros como de igual modo fueron celebrados los juicios en la corte inferior.

Como el juez inferior en la opinión que para los tres casos escribió para fundamentar sus sentencias declaró probados todos y cada uno de los hechos alegados en la demanda y esenciales para constituir la causa de acción que se ejercitaba y expuso, además, que se fundaba en la regla 11 del reglamento y tarifas de la compañía demandada, en el artículo 145 de la Ley de Policía de Ferrocarriles que consideró vigente, en los artículos 361, 362 y 363 del Código de Comercio, en los artículos 138 y 139 del reglamento de la Ley de Policía de Ferrocarriles y muy especialmente en la sentencia del Tribunal Supremo de España de 7 de octubre de 1899, alega ahora la parte apelante como motivos de error de las sentencias, los siguientes:

1°. Error de ley por aplicación indebida al caso de autos,

en que se reclama el valor de mercancías destruídas por incendio, del artículo 145 del reglamento de la Ley de Policía de Ferrocarriles, que se refiere taxativa y terminantemente a la sustracción y deterioro de efectos entregados para su transporte, ya provenga el daño de actos de los empleados o de los extraños concurrentes a sus oficinas.

2°. Igual error de ley al estimar vigente en la actualidad y aplicar a este caso disposiciones del reglamento de la Ley de Policía de Ferrocarriles que ha sido derogada.

3°. Error por falta de aplicación al caso del reglamento y tarifa para el transporte de pasajeros, carga y mensajería de la American Railroad Company of Porto Rico, aprobado por el Consejo Ejecutivo el día cinco de mayo de 1907, cuyo artículo 16 exime de responsabilidad en todo daño ocasionado por incendio.

4°. Igual error por infracción de la estipulación del contrato que exime a la compañía de responsabilidad por daños debidos a acontecimientos imprevistos o inevitables: estipulación expresamente aceptada por los demandantes, entre las varias que obran al dorso de cada declaración de expedición por ellos suscritas.

5°. Igual error al estimar la corte como fundamento de responsabilidad para la compañía la ausencia en las declaraciones de expedición de las letras "R. D." o de las frases "a riesgo del dueño", exigidas por la regla 11 de su clasificación de mercancías, siendo así que aquellas letras y frases son exigidas a los cargadores como requisito formal para disfrutar del beneficio de las tarifas reducidas.

6°. Igual error por aplicación indebida al presente caso de la doctrina legal que consagra la sentencia del Tribunal Supremo de España de 7 de octubre de 1899, al amparo de leyes no vigentes en esta isla.

7°. Error de hecho al declarar por el resultado de la evidencia que el incendio de agosto de 1916, causa inmediata de los daños perseguidos, se originó por la negligencia de la compañía.

8°. Igual error al declarar también que por la negligencia de la demandada el incendio se trasmitió del almacén en que se originó a los vagones que guardaban las mercancías destruídas.

Aunque la corte inferior cita el artículo 145 como de la Ley de Policía de Ferrocarriles esto ha sido sin duda una equivocación, ·pues dicha ley no contiene tal número en su articulado .y evidentemente se refiere al 145 del reglamento para la ejecución de la Ley de Policía de Ferrocarriles.

En el primer motivo de error alegado se limita la parte. apelante a sostener que el artículo 145 citado por el juez, y que es del reglamento, no tiene relación alguna con los casos de destrucción por incendio como es el que nos ocupa, sino que se refiere a los casos de responsabilidad por sustracción de las mercancías o de deterioro de ellas.

El artículo 145 (Compilación, Estatutos Revisados 9034) dice así:

"Artículo 145.—Las empresas serán siempre responsables de la sustracción y deterioro de los efectos que se les hayan entregado, ya provenga el daño de sus mismos empleados o de los extraños que concurran a sus oficinas."

El precepto citado no tiene aplicación al caso presente en que las mercancías cuyo importe se reclama han sido destruídas por incendio, pues se refiere a los casos de sustracción, concepto que entraña la idea de pérdida por hurto o robo y que es distinto del de destrucción por incendio. Para casos como el que nos ocupa existen otras disposiciones en el mismo reglamento.

Al tratar el Código de Comercio de 1885 de los contratos mercantiles de transporte terrestre .dispone en su artículo 355 que la responsabilidad del porteador comenzará desde· el momento en que reciba las mercancías, disposición que también hallamos en el artículo 114 del reglamento para la ejecución de la Ley de Ferrocarriles, promulgados éstos en 1888, Compilación de los Estatutos Revisados página 1374; y con

respecto a esa responsabilidad dice lo siguiente el Código de Comercio:

"Artículo 361.—Las mercaderías se transportarán a riesgo y ventura del cargador, si expresamente no se hubiere convenido lo contrario."

"En su consecuencia, serán de cuenta y riesgo del cargador todos los daños y menoscabos que experimenten los géneros durante el transporte, por caso fortuito, fuerza mayor o naturaleza y vicio propio de las cosas."

La prueba de estos accidentes incumbe al porteador.

"Artículo 362.—El porteador, sin embargo, será responsable de las pérdidas y averías que procedan de las causas expresadas en el artículo anterior, si se probare en su contra que ocurrieron por su negligencia o por haber dejado de tomar las precauciones que el uso tiene adoptadas entre personas diligentes, a no ser que el cargador hubiese cometido engaño en la carta de porte, suponiéndolas de género o calidad diferentes de los que realmente tuvieren. * * * "

"Artículo 363.—Fuera de los casos descritos en el párrafo segundo del artículo 361, el porteador estará obligado a entregar los efectos cargados, en el mismo estado en que, según la carta de porte, se hallaban al tiempo de recibirlos, sin detrimento ni menoscabo alguno y no haciéndolo, a pagar el valor que tuvieren los no entregados en el punto donde debieran serlo y en la época en que correspondía hacer su entrega. * * * "

Examinados estos preceptos se ve que aunque parecen sentar la regla de que el cargador asume los riesgos de sus mercaderías, salvo pacto en contrario, sin embargo lo que hacen es declarar la regla contraria o sea que el porteador responde de las pérdidas o menoscabos de las mercancías que se le entreguen para transportar a menos que pruebe que la destrucción o menoscabo de ellas se debe a caso fortuito, fuerza mayor o naturaleza y vicio propio de las cosas, no obstante lo cual todavía será responsable si el cargador prueba que tales hechos ocurrieron por negligencia del porteador o por haber dejado de tomar las precauciones que el uso tiene adoptadas entre personas diligentes. De acuerdo,

pues, con ellos, basta haber hecho la entrega de mercancías para transporte para que el porteador esté obligado a indemnizar por su pérdida o menoscabo si no prueba que ocurrieron por algunas de las causas que la eximen de responsabilidad.

Aunque el incendio puede ser considerado como fortuito o fuerza mayor, sin embargo no todo incendio tiene ese carácter, sino cuando no se pudo precaver ni resistir. Según Escriche en su Diccionario de Legislación, "Fuerza mayor es el acontecimiento que no hemos podido precaver ni resistir; como por ejemplo la caída de un rayo, el granizo, la inundación, el huracán, la irrupción de enemigos, el acometimiento de ladrones: *Vis major est,* dice Cayo, *ea quae consilio humano neque provideri neque vitari potest,* "y es caso fortuito el suceso inesperado o la fuerza mayor que no se puede precaver ni resistir; Ley 11, Tit. 33, Part. 7º. Tales son las inundaciones, torrentes, naufragios, incendios, rayos, violencias, sediciones populares, ruinas de edificios causadas por alguna desgracia imprevista y otros acontecimientos semejantes". No todo incendio es caso fortuito, dijo el Tribunal Supremo de España en su sentencia de 7 de octubre de 1899, por lo que el incendio ocurrido en mercancías entregadas a un porteador para su transporte y cuyas causas se desconocen no puede ser considerado como fuerza mayor o caso fortuito porque no puede determinarse si pudo ser precavido o resistido.

Por su parte el reglamento citado de ferrocarriles contiene las siguientes disposiciones:

"Artículo 138.—La prueba de los casos de fuerza mayor corresponde a la empresa, y mientras no la verifique, quedará subsistente su responsabilidad.

Artículo 139.—No se tendrá por caso de fuerza mayor el robo sino cuando la empresa haga constar que hizo cuanto le fué posible para impedirlo; tampoco el incendio, si no prueba que ni fué ocasionado por la imprudencia o descuido de sus empleados ni por la insuficiencia o mala condición de los medios de transporte."

Un examen comparativo de estos últimos preceptos con los anteriores del código demuestra que tanto el 138 como el 362 establecen la regla de que la prueba de los casos de fuerza mayor corresponde al porteador, y que el 139 aclara que el incendio no será considerado como fuerza mayor si el porteador no prueba que no fué ocasionado por su imprudencia o descuido, cambiando así la regla del artículo 362 según la cual probado por el porteador un caso fortuito o de fuerza mayor queda exento de responsabilidad si no prueba el cargador que ocurrió por su negligencia o descuido. De acuerdo, pues, con dicho reglamento, posterior al código, en caso de incendio no le basta al porteador probar que fué debido a un caso de fuerza mayor sino que tiene que probar además que no fué ocasionado por la imprudencia o descuido de sus empleados ni por la insuficiencia o mala condición de los medios de transporte. Por consiguiente, de acuerdo con el Código de Comercio y con el reglamento citado lo primero que tiene que probar el porteador para estar exento de responsabilidad es que el incendio fué debido a fuerza mayor o a caso fortuito.

Como consecuencia de lo que llevamos dicho y toda vez que la responsabilidad del porteador no surge de las disposiciones del Código Civil sobre culpa y negligencia sino del Código de Comercio y del reglamento a que venimos refiriéndonos que le imponen responsabilidad por las mercancías que se le entreguen para transporte si no prueba el caso fortuito, la fuerza mayor o el vicio y naturaleza propio de las cosas, en las reclamaciones por pérdida o menoscabo de las mercancías no es necesario alegar que fueron motivados por la negligencia del porteador sino que fueron entregados y no devueltos o que lo han sido con daño, así como su valor, para que surja el derecho a reclamar su importe o el de su menoscabo. En esta forma se estableció la demanda en el caso que hemos citado del Tribunal Supremo de España, que se halla en el tomo 88, página 28 de la Jurisprudencia Civil.

Sostienen sin embargo los apelantes en el segundo motivo de su recurso ·que los artículos 138 y 139 del reglamento citado no están en vigor porque en 1902 el Procurador General de esta Isla, Hon. James S. Harlan, basándose en que los poderes de inspección, vigilancia y policía de los ferrocarriles son de necesaria existencia en relación con el interés de la seguridad pública estima vigentes las disposiciones de dichas leyes aun cuando subordinadas a las facultades del Consejo Ejecutivo en materia de franquicias, privilegios y concesiones y sujetas a las enmiendas y reglamentaciones que acordase el poder legislativo: en que cuando se hizo la compilación de los estatutos revisados de 1911, al insertarse en el apéndice la ley y el reglamento de policía de ferrocarriles se hizo constar que se publicaba porque pudiera ser que estuvieran en vigor ciertas disposiciones de ellos aunque algunas de las otras han sido sustituídas por leyes aprobadas por la Asamblea Legislativa o son incompatibles con ciertas leyes de los Estados Unidos aplicables a Puerto Rico; en que la Corte de Distrito de los Estados Unidos para Puerto Rico en 1914 resolvió en un pleito de Amós Robles contra American Railroad Company of Porto Rico que le Ley de Policia de Ferrocarriles en vigor bajo la soberanía de España es incompatible con las instituciones americanas; en que, aparte de esos precedentes y de las razones que los fundamentan, hay que proclamar la derogación de tales leyes porque la Asamblea Legislativa de esta Isla y el Consejo Ejecutivo en ejercicio de las atribuciones que les confiriera la Ley Foraker tienen legislado especial y señaladamente sobre todas las materias concernientes a ferrocarriles en las leyes referentes a porteadores públicos en 1907, en la de corporaciones de servicio público en 1908, en la de regulación de transporte por ferrocarril en 1911, y en una infinidad de ordenanzas, reglas y tarifas, y que en todos esos cuerpos legales, a continuación de los preceptos que los integran, en su totalidad distintos o contradictorios de la Ley

de Policía de Ferrocarriles antigua va la cláusula deroga-
toria general de toda ley o parte de ella opuesta a la misma.

Es cierto que muchas de las disposiciones de la Ley de
Ferrocarriles y de su reglamento son incompatibles con nues-
tras instituciones políticas actuales pero hay muchas dispo-
siciones de la ley, como la que se refiere a la responsabi-
lidad de las compañías de transporte en cuanto al cuidado
y responsabilidad de los efectos que se le entregan, que no
ofrecen dificultad alguna en su aplicación y así el Sr. Harlan
estimó vigente la ley aunque subordinándola a las faculta-
des del Consejo Ejecutivo en materia de franquicias, privi-
legios y concesiones y sujeta también a las enmiendas y re-
soluciones del poder legislativo.    En cuanto a la cita que
hace del funcionario que llevó a efecto la recopilación de los
Estatutos Revisados se ve que admite que la ley puede estar
en vigor en algunas de sus disposiciones, y con respecto a
la del caso de Amós Robles, se sostiene en esa sentencia que
en cuanto sean aplicables los antiguos reglamentos se con-
siderarán como principios que regulan la negligencia bajo
la actual soberanía.

En cuanto a las leyes mencionadas por el apelante como
posteriores y contrarias a dicha ley y reglamento nada con-
tienen sobre responsabilidad de las compañías de ferroca-
rriles por la falta de entrega de las mercancías que se le
confíen y, por tanto, no la modifican ni derogan.    Así, pues,
los artículos 138 y 139 del reglamento citado, promulgado
en febrero de 1888 para la ejecución de la Ley de Policía de
Ferrocarriles y contenido en los Estatutos Revisados, seccio-
nes 9027 y 9028 no están derogadas por las leyes citadas por
el apelante.

El tercer motivo de error alegado se funda en que la
corte inferior dejó de aplicar la regla 16 de un reglamento
aprobado por el Consejo Ejecutivo en 7 de mayo de 1907
que produjo como prueba y según la cual las compañías ferro-
viarias no son responsables de las pérdidas o averías que
sufran las mercancías en casos de incendio, excepto cuando

resulte por su negligencia, regla que sostiene el apelante modifica y deroga el artículo 139 del reglamento para la ejecución de la Ley de Policía de Ferrocarriles porque no impone a las compañías el deber de probar que no incurrió en negligencia y restablece el precepto del artículo 362 del Código de Comercio que impone esa prueba al cargador, porque la regla 16 sigue el principio general de que hay que probar la negligencia de la parte contra quien se reclama.

La admisión de esa regla como prueba fué objetada por las partes demandantes, entre otros motivos, porque el Consejo Ejecutivo no tenía facultad para legislar sobre responsabilidad de las compañías y creemos que la parte apelada tuvo razón en este particular porque la facultad que la sección 32 de la Ley del Congreso de los Estados Unidos de 12 de abril de 1900, conocida como Ley Foraker concede al Consejo Ejecutivo para la concesión de franquicias, derechos y privilegios o concesiones de carácter público o cuasi público no lo autorizaba para determinar y regular la responsabilidad de las compañías por las pérdidas o averías de las mercancías, porque esta facultad estaba reservada a la Asamblea Legislativa y por tanto el artículo 139 citado no pudo ser enmendado por el Consejo Ejecutivo restableciendo de ese modo el artículo 362 del Código de Comercio.

El cuarto motivo de error se funda en que la corte inferior dejó de aplicar una de las condiciones del contrato de expedición que aparece al dorso de la carta de porte según la cual la compañía no será responsable por accidentes o demoras ocurridos por acontecimientos imprevistos e inevitables, alegando la apelante que lo imprevisto es el caso fortuito, el suceso inopinado que no se puede prever ni resistir y entre ellos el incendio. Esto es cierto, pero también lo es que esa condición no es otra cosa que la reproducción de la disposición legal según la que las compañías no responden en esos casos cuando prueban el caso fortuito o la fuerza mayor, por lo que la cuestión quedó reducida a determinar si los probó, como luego veremos.

Quinto error: Se apoya en haber fundado la corte inferior sus sentencias en la ausencia de las declaraciones de expedición de las palabras "a riesgo del dueño", que se sustituyen por las letras "R. D." exigidas por la regla 11 de su reglamento sobre clasificación de mercancías.

Se dice en esa regla que como se concede a la compañía el derecho de fijar un límite de responsabilidad por la carga que se le entregue para transportar con tal que establezca para su transporte tarifas reducidas, siempre que la expedición se haga a riesgo del dueño en cuanto a pérdidas o averías y corriendo el remitente todo riesgo en el transporte, excepto el que pueda ocurrir por negligencia de la compañía; a fin de poder disfrutar de dichas tarifas reducidas tendrá el remitente o su autorizado representante que estampar y firmar de su puño y letra en la declaración de expedición y en el talón o resguardo o "bill of lading" o en ambos, que se dan al entregar toda carga, las palabras "se hace la expedición a riesgo del dueño * * *" lo que pondrá a la compañía a cubierto de toda responsabilidad en caso de ocurrir lo que se provee en la nota.

Como los remitentes en estos casos no estamparon sus firmas en las cartas de expedición haciendo constar que la remisión se hacía a riesgo del dueño, ni constan en ella las letras "R. D.", es claro que no asumieron los riesgos a que dicha regla se refiere, en cuanto a estos casos. Así, pues, esa cláusula contractual debió tenerse en cuenta porque demuestra la falta de aceptación de todo riesgo que no sea por negligencia y que la compañía está obligada a responder sin tal limitación.

Sexto error: Se funda en que se hizo por la corte inferior aplicación indebida de la doctrina legal de un fallo del Tribunal Supremo de España de 7 de octubre de 1899.

En esa sentencia se declara la responsabilidad de la compañía por mercancías averiadas por incendio ocurrido en un vagón donde se transportaban y se funda en el artículo 362 del Código de Comercio y en el artículo 139 del regla-

mento para la ejecución de la Ley de Policía de Ferroca-
rriles.  En ella se declara, además, que no todo incendio es
caso fortuito y que la compañía debe probar que no ocurrió
por su culpa o negligencia ni por la insuficiencia o mala cali-
dad de los medios de transporte; y el motivo que tiene el
apelante para sostener que no es de aplicación a estos casos
es porque entiende que los preceptos legales que cita han
sido modificados en esta Isla.

No es sostenible este motivo de error porque según he-
mos dicho antes la materia de responsabilidad en caso de
pérdidas o averías de mercancías, consignada en el artículo
362 del Código de Comercio, y en el artículo 139 del regla-
mento antes mencionado no ha sido modificado por ninguna
ley posterior.

Como resumen de las cuestiones que hemos considerado
en los precedentes motivos de error podemos concretar la
cuestión de derecho que de ellos surge diciendo que, en el
estado actual de nuestras leyes no basta que ocurra un in-
cendio que destruya o averíe mercancías que se hayan en-
tregado a una compañía de ferrocarriles para su transporte
para que esté exenta de responsabilidad, sino que tiene que
probar sus causas para poder deducir de ellas que constitu-
yeron un caso fortuito o de fuerza mayor, porque no pudie-
ron ser precavidas ni resistidas, y que no fueron debidas a
imprudencia o descuido de sus empleados ni a la insuficiencia
o mala condición de los medios de transporte; negaciones
que tienen que probarse por evidencia de ordinaria aten-
ción y cuidado de una persona diligente en ocasiones pare-
cidas. *Lehman Sterm & Co.* v. *Morgans L. & T. R. & S. S.
Co.*, 70, L. R. A. 564.

Expuesto todo lo que precede podemos examinar los dos
últimos motivos de los recursos que se fundan en que la
corte inferior cometió error de hecho al estimar que el fuego
se inició por negligencia del apelante y que también por ella
se comunicó a los vagones que estaban cargados con las mer-
cancías cuyo importe reclaman los apelados.

Ambas partes litigantes presentaron evidencia testifical con respecto al incendio, siendo la de los demandantes la siguiente:

Eleno Torres era sereno de la estación del ferrocarril de Ponce cuando ocurrió el incendió y tenía obligación de llamar por teléfono cada media hora al despachador de trenes de la estación de Mayagüez; dice que la compañía tenía antes un telefonista para la noche pero que entonces solo lo había de día y se iba a las nueve de la noche; que esa noche a las dos llamó a Mayagüez y después que le contestaron salió para fuera y vió un humo que salía por la parte de atras del almacén, fué hacia él y notó que salía del almacén; que le dió la vuelta luego encontrando cerradas las puertas exteriores y también la puerta de llave; que enseguida fué al teléfono y comunicó el incendio al cuerpo de bomberos, avisó también a Mayagüez y se dirigió a sacar una máquina para salvar algunos vagones que habían allí; llegó con la máquina pero como hay un trecho regular de la estación a la casa de máquinas en lo que fué y volvió ya el fuego estaba arriba y ardía el techo del almacén; que pegaron la máquina y sacaron algunos vagones que todavía no estaban con fuego; que la compañía había dado órdenes de que hubieran máquinas con presión durante la noche y en aquella la había con presión regular; que no tardó mucho en volver porque enseguida que fué llamó al sereno del depósito de máquinas que todavía no había notado el fuego, llegó en eso un maquinista llamado Betancourt, cogió la máquina y salieron para fuera porque de la estación a la casa de máquinas es algo lejos y que aunque fué corriendo se tardó algún tiempo, como quince minutos en lo que salió con la máquina y cogieron los vagones; que el jefe de la estación era Gelabert y el de transporte Rivera; que el testigo era el único que había en la estación vigilando y que cuando iba al teléfono nadie quedaba en la vigilancia, pues en aquel tiempo estaban arreglando la estación; que fué despedido de su empleo a los dos o tres días del incendio suponiendo que fué por él.

Darío Suárez, era el jefe de la detective de Ponce en aquella noche y dice que no se había acostado todavía y cuando llegó el fuego ya estaba el almacén completamente quemado; que según fué la alarma fué llegando mucha gente y por mucha diligencia que hicieron el fuego se propagó a unos vagones que estaban al lado del almacén; que había un sereno que no sabía dar explicación; después llegaron el jefe de la estación y otro jefe más; que cuando él llegó todavía no se habían incendiado los vagones; que las máquinas tardaron en llegar como treinta o treinta y cinco minutos y salvaron algunos vagones pero otros se quemaron; que cuando llegó al fuego estaba concretado al almacén que estaba todo incendiado por dentro; no sabe la hora exacta a que llegó, pero sabe que la alarma del fuego fué de dos y media a tres de la mañana y se enteró de ella estando en la plaza de las Delicias de Ponce; que fué en coche hacia el fuego y tardaría en llegar como dos o tres minutos; que habían vagones entre el almacén y la estación.

Lucas Alvarez, estaba empleado en el ferrocarril en Ponce como telefonista; en la fecha del incendio prestaba servicios solamente de día hasta las nueve de la noche y el otro telefonista había sido suprimido; que al sereno se le había impuesto la obligación de llamar por teléfono al despachador de Mayagüez cada media hora; que después que sale el último tren a las nueve de la noche no tiene el testigo servicio alguno que hacer con respecto a trenes; que el testigo se ha dormido algunas veces cuando prestaba servicios de noche y que la llamada que tiene que hacer el sereno era para que no se durmiera; que después que se retiraba a las nueve de la noche no había más servicio de trenes.

Luis de Jesús, es farmacéutico y en aquella fecha era gerente de una de las sociedades demandantes; dice que fué al incendio a eso de las dos o dos y media de la mañana; cuando llegó empezaban a caer las paredes del almacen y comenzaban a quemarse algunos vagones; que se perdió bastante tiempo porque parece que no había gente experta en

desconectar los vagones que allí habían; que luego llegaron máquinas más de media hora después que él llegó allí.

Pedro Shuck, jefe de bomberos de Ponce en aquella noche, dice que el fuego fué como a las dos de la mañana y llegó de los primeros, siendo ya entonces el almacén pérdida total; que había un gran número de vagones no solo los que estaban pegados al almacén sino en otras líneas; que tuvieron mucho trabajo en llegar al sitio del fuego para hacer las tomas de agua; que combatieron primero a los vagones, porque el edificio era ya pérdida total; que trataron de auxiliar los vagones; que en el momento del fuego no había máquinas pues si las hubieran habido se hubieran salvado los vagones; que cuando llegó ya habían cogido fuego tres vagones que estaban contiguos al almacén; que una máquina tardó en llegar como media hora y la otra estaba levantando vapor por lo que calcula que como una hora después de empezado el fuego llegaría la máquina y como media hora después de haber llegado él; calcula que el fuego tendría como quince o veinte minutos cuando él llegó al sitio porque en el aviso del parque de bomberos siempre transcurre como un cuarto de hora y cuando llegó al fuego ya el almacén era pérdida total; que como el Parque de Bomberos tiene teléfono tan pronto avisan un incendio lo llaman primeramente a él y después a los demás oficiales; que llegaron dos máquinas a prestar auxilio, primero una y después la otra, pero cuando llegó la máquina ya no había para qué, ya el fuego estaba localizado; que esa noche no habían máquinas con fuego levantado; que sacaron a mano algunos vagones que pesaban treinta y cuatro y treinta y cinco mil libras; que en cada línea de vagones habían como seis, ocho o diez; que habían muchos vagones y no sabe cuanto tiempo tardaron en avisarle desde el parque de bomberos, pero que avisan enseguida; calcula que el fuego empezaría media hora antes de llegar él; que cuando llegó vió humo y había mucha llama; que no tardó más de diez minutos en llegar; que si hubiera habido una máquina la hubiera dedicado a sacar los vagones

que estaban contiguos al almacén sin ser necesario sacar antes otros vagones porque allí hay desvíos; que habían vagones como los que estaban contiguos al almacén que alcanzaban casi al mismo depósito de las máquinas por lo que se hubieran podido sacar esos vagones y entonces trabajarse mejor; que se quemaron tres vagones que estaban contiguos al almacén y con los carbonizados cree que seis o siete, pero no sabe el número exacto; que en el parque de bomberos hay siempre guardia de noche que a la voz de fuego sale con las bombas, hace sus establecimientos de toma de agua y cuando llega el personal regresa al parque.

Por su parte la demandada presentó también prueba de los siguientes testigos:

Juan Rodríguez Cintrón, empleado de la compañía como despachador de trenes de Mayagüez, tenía entre otros deberes el de que los empleados de las estaciones estuvieran en sus puestos; que el sereno de Ponce, Eleno Torres, tenía instrucciones de llamarlo a él cada media hora a Mayagüez para conocer que no se dormía; que la noche del incendio en Ponce lo llamó Eleno Torres después de las doce o la una de la mañana pero no recuerda la última vez que lo llamó antes de tener noticias del incendio, pero cada media hora llamaba; que le avisó del incendio por teléfono; que durante toda esa noche Eleno Torres llamó porque sabía que si no lo hacía lo podía despachar al otro día; que en el mes de agosto después de las nueve de la noche no había más trenes en Ponce hasta la madrugada.

Angel Rivera, empleado de la demandada tenía a su cargo el tráfico de Ponce y dice que entre el almacén y la estación hay siete vías; que supo del fuego como a las dos y media de la mañana estando en su casa distante de la estación como ochocientos metros; que no estaba esa noche en la estación porque no era tiempo de zafra; al saber del fuego fué enseguida a la estación y encontró el fuego, a los bomberos y al personal con una máquina pegada muy lejos en un tren que había y detrás estaba un tren con petroleo; ayudó a

sacar el tren de petroleo porque contenía un vagón con gasolina y quiso quitar la carga peligrosa para después ir a las otras vías; que se quemaron totalmente tres vagones y otros dos se quemaron algo, estando los tres primeros junto a las puertas del almacén; que los bomberos tenían la manguera por encima de los vagones echando agua; que desde su casa tardaría en llegar al sitio del fuego como diez minutos o más; que le avisó su esposa cuando pasaron los bomberos; que todo el personal de las máquinas y algunos conductores duermen al lado del almacén en una casa que hay allí y estaban allí esa noche; que había dos serenos, uno en el taller y otro en la estación; que para salir una máquina del taller tenía que ir en dirección a ''Tallaboa'' para cambiar las agujas; que cuando llegó estaba todavía el almacén en pie pero todo incendiado; que las paredes del almacén cayeron sobre los vagones y tres de ellos cogieron fuego; que en uno de ellos había una motocicleta y creo que el vapor hizo explotar la gasolina y el fuego entonces tomó más incremento; que habían siete vías estando en la quinta el tren de petroleo que sacaron y la sexta también se quitó que era donde estaba el tren; que llegó en el momento que el personal de máquinas estaba trabajando y sacando el tren con petroleo.

Antonio Vázquez, es peón del almacen del ferrocarril y el jefe era Octavio Wys y su ayudante Marín; que el día del incendio trabajó hasta las cinco y media de la tarde y luego cerró todas las puertas del almacén, quedando abierta la que tiene llave, la que cierra el jefe del almacén y luego entrega la llave al jefe de estación; que cuando el testigo cerró las puertas que le correspondían no olía a quemado; que el almacén estaba medio de carga y consistía en ferretería y en tres cajas que habían de paso.

Ernesto Gelabert era el jefe de la estación y vivía a cinco minutos de ella porque estaban pintando la estación y no podía vivir allí entonces con la familia; que el jefe del almacén Wys cerraba y le llevaba la llave que conser-

vaba el testigo hasta el día siguiente; que tuvo conocimiento del incendio cuando estaba casi extinguido por completo; que aquella tarde Wys le entregó la llave; que el testigo salió a las diez de la noche de la estación para su casa y no ocurría nada anormal en el almacén; que lo revisó todo antes de irse; que cuando le entregaban la llave del almacén no siempre iba a revisar si las puertas estaban cerradas y esa tarde no lo hizo, pues algunas veces daba sus vueltas pero no siempre.

Modesto Rosa es sereno de máquinas por la noche en la estación de Ponce y dice que supo del fuego cuando el sereno de línea se lo avisó; que esa noche había tres máquinas en el depósito y estaban bajo presión; que enseguida preparó una máquina que salió como quince o veinte minutos después, pues como tiene cincuenta libras de presión enseguida salieron a coger el material que había en la línea; que lo primero que hicieron fué coger los coches y unos pipotes que habían con petroleo y los pusieron en la línea general; que el sereno le abría las agujas para entrar y salir y el testigo y el maquinista movían la máquina; que trabajó contínuamente saliendo de una vía y entrando en otra; que estaban ellos tres pero fué llegando gente después que habían sacado los pipotes y vagones; que cuando le entregan las máquinas se levanta el fuego y siempre se sostiene la presión con cincuenta o sesenta kilos y que cuando hay que salir se riega el fuego enseguida y tardan en levantar vapor como quince minutos pero puede salir con cincuenta kilos.

Juan Betancourt es maquinista de la demandada y estaba en Ponce la noche del incendio durmiendo en la casa que les tiene la compañía a cuarenta metros del almacén; dice que sintió tres tiros de revolver, se levantó y abrió la puerta y enseguida la llama se le tiró encima porque era cerca y entonces gritó a los demás que estaban durmiendo para que se levantasen y se fué corriendo hacia el depósito donde estaban las máquinas para poder salvar los vagones que estaban en las líneas; que encontró la máquina de reserva, que es la de maniobras, y dos máquinas más; al llegar al

depósito de máquinas encontró al sereno que estaba preparando una máquina; que cuando concluyen el servicio por la tarde se deja el fuego de las máquinas en reserva para que se encuentre en cualquier momento en que se necesite porque se les deja a las máquinas 150 ó 175 libras de modo que por la mañana amanezcan con 50, 75 ó 100 libras; que las máquinas en el transcurso de la noche tienen vapor y tienen que amanecer con él; que cuando iba corriendo para allá el sereno de la estación iba delante y le dijo que preparara las agujas para poder sacar el tren correo y unos vagones que habían con petróleo; que sacaron los coches y los vagones y los llevaron detrás del taller y regresaron para sacarlos del fuego y los corrieron como quince o veinte metros donde los alcanzaran las mangueras de los bomberos; que cuando llegó la máquina tenía 75 libras de presión y para mover basta solo con 25 por lo que salieron enseguida sin tener que levantar vapor; que cuando llegaron los bomberos había sacado los vagones de petróleo y el tren correo; que los vagones de petróleo estaban en la cuarta vía frente al almacén y el tren de pasajeros en la quinta y las líneas sexta, séptima y octava estaban con vagones; que cuando llegaron los bomberos enseguida trabajaron pero no se podían quitar los vagones que estaban al lado del almacén y tres o cuatro cogieron fuego pero todos los demás que corrían peligro fueron sacados; que cuando llegaron los bomberos estaban cogiendo fuego los vagones; que no llevó esos vagones hacia Guayama porque no podía pasar por debajo del fuego y porque no había donde llevarlos ni con qué apagarlos; que solamente habían las mangueras que llevaron los bomberos; que obró por su cuenta mientras llegaron los bomberos pero después éstos tomaron la dirección; que cuando llegaron los bomberos ya había allí una máquina de que pudieran disponer; que para llegar al sitio en que se quemaron los vagones había antes que sacar todo el material que estaba al lado de allá.

De toda esa prueba resulta que si bien la apelante tomaba algunas precauciones para vigilar las mercancías que se le entregaban para transportar y para prestar auxilio en caso necesario con sus locomotoras, sin embargo no ha podido probar la causa inicial del incendio que tuvo lugar en su almacén en el que existían algunas mercancías y que luego se comunicó a los vagones en que estaban cargadas las mercaderías pertenecientes a los apelados, que fueron destruídas y cuyo importe reclaman, por lo que, de acuerdo con los principios de derecho que hemos consignado, no podemos estimar que probó la apelante un caso fortuito o de fuerza mayor que la exima de responsabilidad en estos casos y por tanto que la corte inferior cometiera error al condenarla con esa prueba a pagar las cantidades especificadas en las respectivas sentencias.

Las sentencias apeladas deben ser confirmadas.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Asociados Wolf, del Toro y Hutchison.

El Juez Presidente Sr. Hernández disintió.

———

OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE SEÑOR HERNÁNDEZ.

Se trata de exigir responsabilidad al porteador como consecuencia de un contrato de transporte en que los géneros no fueron entregados a sus dueños, por haber sido destruídos por causa de incendio de los vagones del ferrocarril donde estaban.

El incendio no se *originó* en los vagones sino en un almacén del porteador desde el cual se comunicó a aquellos. No fué el incendio un accidente del transporte sino del incendio del almacén y por tanto la responsabilidad del porteador no es principal sino accesoria de la responsabilidad que pudiera ser exigible al responsable del incendio del al-

macén por culpa o negligencia. Esa responsabilidad no se regula por los preceptos del Código de Comercio ni de la Ley de Policía de Ferrocarriles y reglamento para su ejecución, si es que ley y reglamentos están vigentes, sino por la Ley Común o sea por los preceptos del Código Civil aplicables al caso. La culpa o negligencia deben probarse no por el porteador sino por los que reclaman la indemnización, como ya lo exige el precepto general de derecho sustantivo y adjetivo que imponen al demandante la obligación de probar su acción.

El artículo 139 del reglamento para la ejecución de la Ley de Policía de Ferrocarriles preceptivo de que no se tendrá por caso de fuerza mayor el incendio, si el porteador no prueba que ni fué ocasionado por la imprudencia o descuido de sus empleados ni por la insuficencia o mala condición de los medios de transporte, caso de ser aplicable, sería una excepción al precepto general anteriormente expresado, y por tanto la interpretación estricta, siendo aplicable únicamente cuando el incendio se originara en los vagones conductores de las mercancías y no cuando el incendio originado en un almacén independiente se comunicó a los vagones.

La sentencia del Tribunal Supremo de España de 7 de octubre de 1899 no es de aplicación al presente caso, puesto que ella se refiere a un incendio que tuvo su origen en un vagón de la compañía porteadora y no en otro lugar independiente.

Y es de notar que el artículo 361 del Código de Comercio se contrae a los daños y menoscabos que experimenten los géneros *durante* el transporte.

Por las razones expuestas disiento de la opinión de esta Corte Suprema y opino que deben revocarse las sentencias apeladas.