In re LAND MANAGEMENT, INC., Debtor.

Autoridad DE TIERRAS, Plaintiff,

v.

LAND MANAGEMENT, INC., Defendant.

Bankruptcy Nos. B-79-00324-A, 80-0032.

United States Bankruptcy Court, D. Puerto Rico.

Sept. 17, 1981.

Giselle López Bajandas, Hato Rey, P.R., for plaintiff.

Charles A. Cuprill, Ponce, P.R., for defendant.

## OPINION AND JUDGMENT

ANTONIO I. HERNANDEZ–RODRIGUEZ, Bankruptcy Judge.

We have before our consideration at this time a complaint filed by the Autoridad de Tierras de Puerto Rico (Lessor) against Land Management, Inc., (debtor-lessee). The plaintiff requested therein the lifting of the automatic stay provisions of Section 362 of the Bankruptcy Code and/or that defendant be ordered to surrender possession of the premises in question, to wit, two farms known as Hacienda Destino and Hacienda Florida, both situated in Santa Isabel, Puerto Rico. Their contentions were based on the allegation that defendant held the land at sufferance with no legal title to the possession of the same. Defendant timely answered and counterclaimed. After extensive discovery, plaintiff requested and was granted the right to a bifurcated hearing, so that the counterclaims are not now at issue. A trial was held in respect to the original complaint and on the last day of the same, once the parties had submitted their respective cases the matter was taken under advisement, pending the filing of Memorandums by the respective counsellors. These were filed subsequently by both parties.

After undertaking an exhaustive study of the voluminous record in this case, carefully considering the testimony of witnesses, extensive documentary evidence, and the various memorandums and briefs submitted by counsel, we have arrived at the following:

1. See Defendant's Exhibit # 1.

## 1. FINDINGS OF FACT:

(A) Mr. John Scussel, actual president of debtor-corporation, and a farmer by profession, visited Puerto Rico on/or about December 1976 and became aware of the vegetable program that was being developed by the Department of Agriculture.

(B) During the early part of 1977, Mr. Scussel and other persons interested in participating with him, namely, Paul Wolf and Luis Herrero, entered into conversations with the then Under-Secretary of Agriculture, Mr. Giovanni de Choudens and in March of the same year, the latter was informed of the former's interest in certain farm land (land that eventually became subject of the lease agreement, at issue now before us) and in their desire to participate in the vegetable program.

(C) Around this time, the aforestated persons (Scussel, etc.) arrived at the decision to form a corporation for the purpose of carrying out their farming activities. Land Management, Inc. was created and future negotiations with the Department of Agriculture were effected under the corporation's name.

(D) Once the Autoridad de Tierras (hereinafter referred to as the Authority) approved Land Management's request to participate in the program and assigned them the lands they had solicited, the Authority drew up various proposed drafts for the lease contract to be entered into between the Authority as lessors and at least one was prepared with Land Management, Inc., as named lessee.[1] The land subject of the lease comprised over 900 acres of land.

(E) On September 1, 1977 the Leasing Committee of the Department of Agriculture held a meeting[2], in which it was decided that a change would have to be made to the aforestated draft of the proposed lease contract prepared for Land Management, Inc. They stated during that meeting that:

"In view that the Land Authority cannot lease in excess of 500 cuerdas to a corpo-

2. Minutes of meeting see Defendant's Exhibit # 4.

ration, the contract should be made in the name of an individual, designated by Land Management, Inc." (original in Spanish,—translation ours)

Consequently after this was informed to the would-be lessee, and they chose to designate Mr. Roy M. Spear, a new lease was drawn up by the Authority. The lease in its final form was signed on December 8, 1977, and Roy M. Spear appeared as lessee [3].

(F) It was at the Authority's suggestion, that Land Management, Inc. designated an individual to appear on their behalf. The Authority was and is aware that in reality the lease was with Land Management, Inc. and that Roy M. Spear was used for the purpose outlined in the cited minutes above.

(G) Future documents of the Authority continued in many instances to refer to "lands rented to Land Management, Inc." and not lands leased to Roy M. Spear [4]. Moreover, employees of the Authority in their testimony before this court, and in depositions admitted in evidence, on many occasions referred to the lessee as Land Management, Inc. and all showed an awareness that debtor corporation was the true lessee of the lands in the vegetable program.

(H) The actual farmers of the lands here in question were and are Land Management, Inc. and not Roy M. Spear.

(I) The aforementioned lease signed on December 8, 1977, provided that if the lessee failed to make rental payments as stipulated therein, lessor would have the right to terminate the lease and proceed with eviction proceedings [5].

(J) On September 24, 1979 a letter was allegedly sent to Mr. Roy M. Spear, notifying him of lessor's intention to terminate the lease according to the aforestated lease provision. The date specified in the letter,

in which the termination would take effect was September 30, 1979. Neither Land Management, Inc., nor any officer of said corporation was notified of the Authority's intention to terminate the lease for the non-payment of rental fees. The rental payments that had been effectuated in the past, had been so done by Land Management, Inc.[6]

(K) No legal proceedings were instituted by the Authority to commence eviction proceedings against the lessee. A letter was sent to and received by Mr. John Scussel, president of Land Management, Inc., (sent October 1, 1979 and received October 3, 1979). This letter informed debtor that the lease contract between the Authority and Mr. Speer had been unilaterally terminated by the Authority, pursuant to the contract provision stated earlier, effective September 30, 1979, and informed them that they had forwarded to Mr. Spear their letter of intent to terminate, six days earlier.

(L) Land Management, Inc., on the day following the receipt of the aforementioned letter, filed their petition in Bankruptcy under the provisions of Chapter 11 of the Bankruptcy Code. Consequently, as of October 4, 1979 all proceedings in state courts were stayed; precluding lessor from taking any further action to remove debtor from the premises.

## II. CONCLUSIONS OF LAW:

▇ (A) Our first determination must be whether debtor-corporation was in fact a party to the lease contract here in question. Did Roy M. Spear appear on his own behalf; or on the contrary, was it the intention of the parties that Land Management, Inc. be the true party in interest, and that consequently Roy M. Spear was a "simulated

---

3. See Plaintiff's Exhibit "A".

4. See Defendant's Exhibits 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22.

5. The original in Spanish. The translation of that clause would read as follows:

"The non-payment of the rental fee in the form stipulated in clause two (2) herein, will give the right to the Lessor to deem the lease contract terminated and proceed immediately with the eviction of the lessee, or to proceed with whatever pertinent right or action."

6. See Defendant's Exhibit # 20.

person interposed"[7] or an agent for Land Management, Inc.?

If we are to go beyond the written words in our interpretation of the contract herein, we must take into consideration extrinsic evidence, commonly referred to as parol evidence. Although parol evidence is customarily inadmissible to vary the contents of a contract or other document, case law recognizes exceptions to this doctrine.

It is generally held that the parol evidence rule is not, or is not merely, a rule of evidence, but is a rule of positive and substantive law founded upon the substantive rights of the parties. (*Associated Hardware Supply Co. v. Big Wheel Distributors,* 355 F.2d 114, 3d Cir.). "Whether parol evidence may be admitted in evidence to vary the terms of a written agreement is a matter of substantive rather than evidentiary law" (*Lee v. Joseph E. Seagrams & Sons, Inc.,* 552 F.2d 447, 2d Cir.). Consequently, we must apply state law to resolve this issue. (*Erie v. Tompkin,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188).

Rule 69(b) of the Puerto Rico Rules of Evidence (previously 32 L.P.R.A. 1668) excludes the admittance of parol evidence in order to vary the provisions of a written agreement but adds, in the nature of an exception, that, "This rule does not exclude other evidence of the circumstances under which the agreement was made or to which it is related such as the situation of the subject matter of the instrument or *that of the parties . . .*" (Official translation, Supreme Court of Puerto Rico, emphasis ours.)

The Supreme Court of Puerto Rico has on various occasion interpreted the parol evidence rule as it appeared in 32 L.P.R.A. 1668 and which is practically identical to the present wording.

In *Rossy v. Superior Court* (80 P.R.R. 705) the Court stated that: "The rule which excludes extrinsic evidence to contradict or vary the terms of a written agreement does not preclude proof to show what was the real transaction between the parties . . . even though it appears to be different from

that stated in a public or private instrument." In *Ramirez v. Ramirez* (65 P.R.R. 544) the court instructs us that the parol evidence rule cannot be used to suppress the truth in regards to a transaction, nor to avoid the showing that a written agreement was a mere simulation. See also *Alvarado v. Bonilla* (86 P.R.R. 464).

The Supreme Court of Puerto Rico faced an issue similar to the one before us at this time, in which one person, not interested in the transaction at hand, appeared in lieu of another interested party in the case of *Hernández Usera v. Secretary of the Treasury* (86 P.R.R. 12). The case therein defines a "simulated person interposed" as:

"A person fictitiously interposed in a simulated contract who intervenes therein by mere appearance, as fictitious contracting party, when actually the relationship sought to be established is between the third party and the interested party who does not appear in the contract."

In this same case the Court included the definition of this juridical figure, that is, the interposed third party, as appears in Ferrara's "La Simulación de los Negocios Juridicos" (*Revista de Derecho Privado,* p. 772):

"When executing a juridical business, it is proper to interpose a person who is a stranger for the purpose of concealing the real interested party. This person serves as an intermediary as link between those seeking the effects of the juridical act. The distinguishing characteristics are, in general (1) To place himself between two persons who must be directly linked in the business, or between those with whom the patrimonial content of the business should remain definitively without the intermediary having a personal interest in the business. (2) His function of concealing the real owner of the business who prefers to remain behind the scenes."

The case goes on to conclude in its holding that "in order to determine the juridical effects of a transaction in a contract in

---

7. Term as used in *Hernández Usera v. Secretary of the Treasury* (86 D.P.R. 12.)

which a stranger has been interposed in order to conceal the real person interested, the presence of said intermediary—stranger to the bond created by virtue of the contractual relationship—*should be left out of consideration.*" (emphasis ours).

In the case at bar, the person of Roy M. Spear, fits the definition of "simulated person interposed" for he appears for the person with a real interest, Land Management, Inc., who must, at the suggestion of the other party, remain behind the scenes. The Authority decided and informed the would-be-lessee that it was necessary to use an individual interposed in order to circumvent the 500 acres law. Land Management, Inc., was induced to use a simulated party, by the Authority, who knew full well that they were contracting with the debtor-corporation. Whereby, according to the holding in *Hernández Usera, supra.*, this third person should be disregarded for he was a mere person interposed or "name lender" and both parties were aware of his position at the time of the signing.

In *Miranda v. El Imparcial, Inc.* (99 P.R.R. 583) the Supreme Court states that to determine the intention of the contracting parties, a court must, "pay attention principally to the acts of said parties contemporaneous and subsequent to the contract". In the case at bar, these actions further serve to convince us that the Authority was aware that the true party in interest was Land Management, Inc., and not Roy M. Spear. In internal documents of the Authority and correspondence written by them after the signing of the contract,[8] they refer to the lessee of the lands in question as Land Management, Inc. Likewise in testimony received from employees of the Authority, they were continuously referring to Land Management, Inc. as the farmers and lessees of the land. The Authority never acted before, during or after the signing of the lease, as if Roy M. Spear were the true party in interest.

Stateside cases cover similar situations within the doctrine of agency. If we consider that Mr. Roy M. Spear acted as an agent for Land Management, Inc., it has been established in case law that as principal (here Land Management) can, in order to establish his right upon a written contract, introduce extrinsic evidence to show that the party who executed the contract, did so as his agent, and upon such evidence, the principal may maintain his right against the other contracting party, despite the fact that the agent signed the contract. The principal is precluded from presenting such evidence, only, if his intention is to claim he is not responsible under the contract and intends to pass on the liability to the agent. In this case we have a principal bringing in extrinsic evidence to prove his rights under a contract, not to pass on liability to an agent. As stated in *United Packinghouse Workers of America v. Maurer-Neuer, Inc.*, 272 F.2d 647, 10th Cir. "If unambiguous language of contract does not show whether party signed as principal or as agent extrinsic evidence may be introduced to show parties' intention."

Whereby, we conclude that it was proper to admit parol evidence in this instance, and that through that evidence, it was proven that the true party in interest, and therefore the lessee in this contract was Land Management, Inc., and that Roy M. Spear acted as a simulated person interposed, or as an agent of Land Management, Inc., with the knowledge and acquiescence of the lessor.

■ (B) Having determined that debtor-corporation was a party to the lease contract here in question, we must now proceed to ascertain if said lease was assumable by the debtor-in-possession.

Lessor negates the existence and hence the assumability of the lease contract utilizing the clause contained in the contract that provided that upon the non-payment of rent, the landlord could terminate the lease. We agree that upon the notification to the president of Land Management, Inc. (letter received October 3, 1979 by John Scussel), the lease could be deemed terminated. (*Federal Land Bank v. Echeandia,* 48 D.P.R.

---

8. See Defendant's Exhibits 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22.

320). But this termination merely provided lessor with the right to initiate eviction proceedings in order to obtain the possession of the land. Termination *per se* did not give the Authority right to take immediate possession of the land without the intervention of the court. More so in this case where the land was being utilized for agricultural purposes. Article 381 (31 L.P. R.A. 1467) recognizes a property interest, in the crops already planted, to the party in possession of the land even after he ceases to be a possessor in good faith. A state court would have been called upon, had debtor not filed Bankruptcy, to determine what portion of the proceeds of the harvest would have belonged to lessee, or his alternate right under the aforementioned article to harvest the crops if the lessor chose this latter alternative. At the moment of the filing of the petition in Bankruptcy, debtor had the possession of the land, no legal proceedings had been initiated to have him removed from the same, and he had an undetermined property right in the crops still unharvested.

For the above stated reasons we believe that the holding in *In re Fontainebleau Hotel Corporation*, 515 F.2d 913 (5th Cir. 1975) is applicable to the case at bar. The issue in this case was very similar to the case at bar and moreover the applicable state law was also practically identical to ours as they were applying Louisiana law. The Fifth Circuit Court of Appeals affirmed a District court stating:

"As no judicial proceedings had been instituted prior to the signing of the petition for reorganization, trustee succeeded to the possession of the debtor ... and it was within the equity power of the court ... to decline forfeiture of the lease, despite the debtor's default in payment of rent, and to continue the trustee in possession, particularly since reorganization of the debtor would not be possible if the trustee was deprived of the possession of the hotel premises, and since any opportunity the creditors might have to recover would otherwise be substantially impaired, if not lost altogether."

It has been held that a Bankruptcy Court can exercise its equitable discretion to deny the enforcement of termination clauses when continuation of the lease would not prejudice the landlord unduly and said termination would render an otherwise promising arrangement under Chapter 11 impossible. (*In re D. H. Overmeyer Co., Inc.*, 510 F.2d 329 (2d Cir. 1975)). In the instant case, debtors filed Bankruptcy the day after receiving effective notification of the intention to terminate the lease contract. Landlord did not incur in the legal costs of initiating eviction proceedings. Lessor did not provide this court with evidence that the continuation of the lease, or its non-termination would cause them undue harm. Lessors would, if the contract is deemed assumable, be afforded the protections contemplated in Section 365 of the Bankruptcy Code.

On the otherhand, debtors would lose all hope of reorganization if the contract is deemed unassumable. They are a farming operation utilizing only the lands here in question ... without them their business would disappear. Whereby, if we weigh the harm to debtor, *vis a vis* the harm to lessor, the scale dips in favor of debtor. We must agree with the House Report No. 95–595 and the Senate Report 95–989, U.S. Code Cong. & Admin.News 1978, p. 5787, as cited in *In re Lafayette Radio Electronics Corp.*, 7 B.R. 189 (Bkrtcy.1980) when stating:

"If the court determines that assumption would substantially further the debtor's reorganization effort and that the rights of other parties to the contract or lease are receiving their due recognition and protection, the court is obliged to grant the necessary approval."

Whereby, we determine that although technically terminated, the lease contract herein is assumable. The debtor still possessed a leasehold interest in the same; and utilizing the equity powers invested in this court, less harm will be done to lessor if lessee is permitted to assume the contract, than the harm that would be caused to debtor and to his unsecured creditors if he

were forced to give up the lands subject of the lease.

■ (C) Our third determination will be to the effect of how much land will debtor be permitted to keep due to the 500 acres law. Article VI, Section 14 of the Constitution of the Commonwealth of Puerto Rico prohibits any agricultural corporation from possessing more than 500 acres of land. This article raised to constitutional mandate Article 58 of The Land Law (Law # 26 of April 12, 1941) which states:

> "The acquisition, holding or any other form of direct or indirect control of land in excess of five hundred (500) acres by any artificial person . . . is hereby declared unlawful. This provision shall be applicable to any extension of land, which, jointly with such land as the acquirer may hold, possess, control, or exploit at the time of acquisition, aggregates over five hundred acres". (28 L.P.R.A. 402)

Article 60 (28 L.P.R.A. 404) goes on to define when an artificial person is considered engaged in agriculture:

> ". . . any artificial person which directly or indirectly, plants, cultivates, harvests, or permits the planting, cultivating, harvesting of, agricultural products on lands belonging thereto, or held, owned or controlled thereby, as well as those which hold, possess or control, or are owners of, lands devoted or that may be devoted to the planting, cultivating or harvesting of, agricultural products, or to any operation, activity or process relating to agriculture."

This all inclusive provision most certainly cover debtors herein. We cannot authorize debtor-in-possession to assume a contract which would be in contravention to local law and a constitutional prohibition. For this reason we are obliged to authorize that debtor-in-possession may only assume the lease contract as to the maximum permitted by law, to wit, five hundred acres.

WHEREBY, in summary of the above conclusions, Land Management, Inc., may, as party in interest and true lessee in the lease contract signed with the Land Authority on December 7, 1977, assume said contract with respect to a maximum of five hundred acres, provided that they meet the requirements established in Section 365(b)(1) of the Bankruptcy Code. Once this decision is final, we will schedule a hearing to determine the specific 500 acres that debtor will retain, provided that he decides to assume the lease contract pursuant to this order. Another hearing will also be scheduled to consider debtor-defendant's counterclaims.

IT IS SO ORDERED.